IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

KIMBERLY M. WYNN,

                                    Plaintiff,

            v.                                              Civil Action Number 3:09CV136

WACHOVIA BANK, N.A, and
WELLS FARGO BANK, N.A.

                                    Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff's Complaint alleging Wachovia: (1) fraudulently and wrongfully terminated Wynn's employment, (2) tortuously converted Wynn's deposit and finances, and (3) willfully and knowingly defamed Wynn by publishing that Wynn was terminated for job abandonment.  (Am. Compl. ¶¶ 12(a)–15(h).)  Defendants now move for summary judgment.  (Doc. No. 19.)  For the reasons below, this Court GRANTS Defendants' Motion as to the Wrongful Termination and Conversion claims, and DENIES the Motion as to the Defamation Claim.

## I.  BACKGROUND

Plaintiff, Kimberly M. Wynn, began her employment as a Lost-Stolen Analyst with Defendant, Wachovia Bank, N.A. ("Wachovia Bank" or "Wachovia"), on October 1, 2007. (Wynn Dep. 45:1–2, May 19, 2009.)  As a Lost-Stolen Analyst, she assisted customers in closing their accounts due to fraud or suspicious activity, and helped reissue new accounts.  (Wynn Dep. 72:11–19.)  Wynn was scheduled to work 10 hours per day, four days per week.  (Defs.' Mot. Summ. J., Ex. A2 at 16.)  Prior to starting work, she completed a Wachovia job application.  (Wynn Dep. 56:3, 56:19–21.)  Wynn testified she

read the application prior to signing, and did not have any questions regarding the

application's contents.  (Wynn Dep. 56:8–14.)  The application contained the following

section entitled, "Acknowledgment Of At-Will Employment":

> I understand that this application does not create a promise of any kind by
> Wachovia.  If I am offered employment, my employment relationship with
> Wachovia will be "at-will."  This means that I have the right to quit my
> job at any time and for any reason I deem appropriate.  Likewise, Wachovia
> may terminate employment relationship [sic], or change the nature of
> the job or job responsibilities, wages, benefits or working conditions, at
> any time with or without cause, and for any reason it deems appropriate.
> While I may receive salary increases, favorable performance evaluations,
> commendations, bonuses, promotions and the like, my "at-will" status will
> not change.  I understand that no change in my "at-will" status, and no
> promise or guarantee of employment, shall occur unless the promise or
> guarantee is clearly stated in a written contract signed by both me and an
> authorized Wachovia representative.

> (Defs.' Mot. Summ. J., Ex. A2 at 11.)

Plaintiff's offer letter contained a similar section entitled "Employment At-Will."  (Id. at

17.)  Wynn stated she read these sections and understood them to mean she was being

hired as an employee at-will.  (Wynn Dep. 62:1–12.)  Wynn also acknowledged reading

and understanding Wachovia's attendance and PTO policies.  (Wynn Dep. 82:5–85:20.)

These policies state:

> **Attendance**
> If employees are absent for a period of two days without notification,
> management will attempt contact.  If an employee remains absent for three
> consecutive days without prior notification or approval, Wachovia will
> assume the employee abandoned the job.  The last day worked will be the
> date of dismissal.

> (Defs.' Mot. Summ. J., Ex. A2 at 22.)

> **Offer Summary, Kimberly Wynn; Other**
> You agree that if, at the time your employment with Wachovia terminates,
> you have taken "Paid Time Off" (PTO) in excess of the amount of PTO you
> have earned, you will reimburse Wachovia for the amount of unearned

PTO that you have taken.  You further agree that the amount of any such reimbursements may be deducted from any compensation due you from Wachovia and that, if the deductions are insufficient to reimburse Wachovia fully, you will remain responsible for the remaining balance.

(Defs.' Mot. Summ. J., Ex. A2 at 16.)

In addition to being an employee of the bank, Wynn was also a bank customer. (Wynn Dep. 63:25–64:3.)  Upon opening her account, Wachovia provided Wynn with a document entitled "Deposit Agreement and Disclosures for Personal Accounts."  (Id.) Paragraph 30 of this Agreement states:

Any pledge or assignment of time deposits and other deposit accounts for security purposes remains subject to our right of setoff and security interest.  If you ever owe us or any of our affiliates money as a borrower, guarantor, judgment debtor or otherwise, including any obligation owed to a financial institution acquired by us, and it becomes due, we have the right under the law (called "setoff") and under is [sic] Agreement, by which you grant us a security interest in your . . . other deposit accounts to use the money from your account(s) maintained with us or our affiliates to pay the debt.

(Defs.' Mot. Summ. J., Ex. A2 at 48.)

Wynn acknowledges receiving the Deposit Agreement.  (Wynn Dep. 98:2—8.)

A.  Wynn's Termination

On February 19, 2008, Plaintiff went to a Wachovia Bank branch to withdraw funds from her account.  (Wynn Dep. 135:6–24.)  At the branch, Wynn learned a flag was placed on her account because a counterfeit check was cashed at a Wachovia Bank branch in May 2007 using her driver's license number.  (Am. Compl. ¶ 3d; Camp Dep. 26:20–28:17, May 27, 2009.)  The bank manager encouraged Wynn to speak with a Wachovia telephone representative, who advised her she could either repay the money, face termination, or resign her position.  (Wynn Dep. 135:6–136:23.)  After this incident, Wynn states Wachovia never contacted her again regarding the check.  (Wynn Dep.

155:19–25.)  Nevertheless, Wynn called her supervisor, Dorothy Camp, to inform her of the problems she was having with her account, and her fears of being fired.  (Wynn 136:1–3; Camp Dep. 25:23–28:17.)  Camp returned her call and stated "she would have to investigate the issue to see what was going on, and that she would" follow-up with Wynn.  (Wynn Dep. 143:1–7.)  Wynn alleges Camp also told her to "call out and use the PTO until a decision or something was made as to what was going to happen."[1]  (Wynn Dep. 143:8–14.)  Camp, however, testifies she merely stated if any allegations about a counterfeit check occurred, Wachovia has "an internal corporate investigative department . . . that handles those type[s] of situations, and if they find it necessary to notify me or ask me questions, then they will do so, but I have not been made aware of any of this."  (Camp Dep. 37:18–25.)  Additionally, Camp tried to reassure Wynn she was not going to be fired or escorted out of the building, and that Wynn should not rely on someone telling her over the phone that she will be fired.  (Camp Dep. 37:23–38:1, 71:9–13.)  After speaking with Wynn, Camp inquired internally about whether "anyone . . . was made aware of Wynn's situation."  (Camp Dep. 40:23-43:2, 50:25-51:14.)

Wynn asserts that based on Camp's directions to "call out" and reassurances she would not be fired, she repeatedly took PTO while the matter was being investigated. (Wynn Dep. 183:13–22.)  Specifically, Wynn states she contacted Camp on February 20th, 21st, 26th, and 27th,[2] and on these days was told to "call out."  (Am. Compl. ¶¶ 3(f)–5(b); Wynn Dep. 183:13–22.)  During this time, Wynn states she continued to

---

[1]      To utilize PTO, Wachovia employees may call an automated system and state the particular date or dates the employee will not be at work.  (Am. Compl. ¶ 4(b).)  This process is called "calling out."  (Id.)

[2]      Wynn noted that she called out in March as well.  (Wynn Dep. 195:21–24.)

phone Camp to find out if "this matter has been cleared up . . . my job is not at stake and . . . I can report back to work as if none of this ever happened. (Wynn Dep. 183:13–184:22, 199:3–8.)  However, Wynn's PTO ran out on February 25, 2008; she subsequently failed to report to work on February 26th, 27th, and 28th, and was therefore terminated. (Defs.' Mot. Summ. J. 7.)  The termination letter stated: "You have not contacted your supervisor since February 25, 2008.  In accordance with bank policy, your employment is being terminated for abandonment of position effective February 28, 2008." (Pl.'s Compl., Ex. 2.)  Wynn admits she did not work these days but states she called in to report her continued absence. (Wynn Dep. 184:6–22.)  Though Wynn was terminated on February 28, 2008, she did not receive her termination letter until March 13, 2008.[3]

B. Debiting Wynn's Checking Account

Effective January 1, 2008, Wynn was eligible to receive up to 120 hours of paid time off. (Defs.' Mot. Summ. J., Ex. A2 at 23—27.)  Her PTO accrued at a rate of 10 hours per month.  (Id.)  Wynn was allowed to take PTO before it was accrued, but if her employment ceased, she was to reimburse Wachovia for the amount of unearned PTO she had taken. (Defs.' Mot. Summ. J., Ex. A2 at 16.)  By the end of January 2008, Wynn had used 47.5 hours of her 120 hour PTO allotment. (Defs.' Mot. Summ. J. 4–5.)  Wynn took additional PTO between February 1 and February 13, 2008, and was absent from work on February 14th, 19th, 20th, 21st, and 25th.  (Id.)  By February 25, 2008, she had utilized all of her annual PTO allotment.  (Id.)

---

[3]      Wynn received the termination letter on March 13, 2008; however, the letter was mailed by Camp—to Wynn's old address—on February 28, 2008. (Camp Dep. 132:23–133:9.)

On February 28, 2008, Wachovia deposited $873.35 into Wynn's Wachovia checking account.  (Wynn Dep. 200:18—25.)  On March 6, 2008, one week after she was terminated, Wachovia debited $844.97 from her bank account to recoup a portion of the PTO that Wynn had taken, but not yet accrued.  (Defs.' Mot. Summ. J. 7.)  Upon learning of the March 6th debit, Wynn attempted to contact Camp.  She was unable to speak with Camp so she contacted "Tim," a Wachovia Bank employee in the Human Resources Department, on March 9, 2008.  (Wynn Dep. 203:11—18; Am. Compl. ¶ 7(a).)  Tim informed Wynn the $844.00 was removed from her account because it was unaccrued PTO.  (Id.)  Wynn spoke with Camp regarding this debit on March 13, 2008.  (Wynn Dep. 218:8—220:10.)  Wynn claims during this conversation, Camp told her to keep calling out and take PTO, but was never told that she had already been terminated.  (Id.)  Later that day, Wynn received the termination letter.  (Id.)  She believed Camp misled her because "regardless of whether [the letter] was sent to the wrong address or not, [she] knew the entire time as my supervisor that I wasn't going to have a job."  (Wynn Dep. 218:17—220—10.)  Wynn once again contacted Camp and left a voice mail message. (Defs.' Mot. Summ. J., Ex. A2 at 63.)  The voice mail stated Wynn did not "100% agree with the [termination], but [she was] not calling to try and get [her] job back . . . ."  (Id.) The remainder of the message informed Camp the termination letter was sent to the wrong address, recounted how Wachovia debited $844.00 from Wynn's account rather than the $15.00 for overpayment of PTO, and requested more information from Camp regarding Camp's role as an Herbal Life distributor.  (Id.)

C. <u>Alleged Defamation</u>

After being terminated for job abandonment, Plaintiff alleges Camp and Katrina Armstrong, a Wachovia Assistant Manager, told numerous "non-supervisory, non-managerial, rank-and-file" employees that Wynn was fired for job abandonment.  (Am. Compl. ¶ 15(b)—(e).)  These statements were allegedly made orally, as well as in a February email.  (Stephanie Braswell Dep. 5:7—17, June 10, 2009.)  According to Stephanie Braswell, a previous Wachovia employee, the email was sent to the entire Lost Stolen Team, approximately 20 people.  (<u>Id.</u>)  Braswell testifies the email stated, "Kimberly Wynn had been terminated for abandonment of her position; she [is] no longer employed by Wachovia."  (Braswell Dep. 6:8—7:20.)  After the email was sent, Braswell recalls speaking to her co-workers Margaret Henry, Theresa Thomas, and Victoria Tucker about the email.  (Braswell Dep. 10:5—18:24.)  Braswell further noted "there were a lot of people talking about the email that day;" however, Braswell is the only employee who testified seeing the email.  (Braswell Dep. 9:7—11, 10:5—18:24.)  Braswell also recalls several other employees saying the email was "messed up," "it didn't make any sense that they would put that information out there," and that it is "not anybody else's business . . . they shouldn't have sent it out to the floor like that."  (Braswell Dep. 10:10—15, 11:4—25.)  As a result of Wynn's termination, the debiting of her account, and the alleged defamation, the entitled matter ensued.

On May 26, 2009, Defendants filed a Counterclaim alleging two counts: (1) Wynn converted $3,278.00, the full amount of the alleged May 2007 counterfeit check, and (2) unjust enrichment for the proceeds Wynn retained as a result of cashing the counterfeit check.  (Countercl. ¶¶ 9–16.)  Defendants now move this Court, pursuant to Federal Rule

of Civil Procedure 56, to grant summary judgment in their favor as they contend no genuine issue of a material fact remains, and therefore judgment as a matter of law, costs, and fees are appropriate.  Plaintiff disagrees.

## II.  ANALYSIS

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion."  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations marks and citations omitted).  In its decision, courts look to the affidavits or other specific facts pled to determine whether a triable issue exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where no genuine issue of material fact exists, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).  Mere unsupported speculation is not sufficient if the undisputed evidence indicates the other party should win as a matter of law.  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008).  However, summary judgment should not be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

A.  Wrongful Termination/Fraud Claim

Plaintiff claims Wachovia wrongfully terminated her employment and committed fraud in "deliberately mis[leading] Wynn into believing that [Camp and Armstrong] were helping Wynn to keep her job . . . [all the while] repeatedly instructing Wynn to take PTO

8

and to 'call out,' which Wynn did . . . [thus creating] false cause for Wachovia to terminate Wynn." (Am. Compl. ¶ 12(a).) Accordingly, Plaintiff claims Wachovia wrongfully terminated Wynn's employment and committed a fraud.

### 1. Wrongful Termination

Virginia strongly adheres to the employment-at-will doctrine. County of Giles v. Wines, 262 Va. 68, 72 (2001). Under this doctrine, an employment relationship is presumed to be at-will and may be terminated for any reason, by any party, upon reasonable notice. (Id.) Nevertheless, the at-will doctrine is not absolute; rather, Virginia recognizes "certain narrow public policy exceptions to this doctrine." Bailey v. Scott-Gallagher, Inc., 253 Va. 121, 123 (1997) (noting public policy exceptions exists, and stating a cause of action for wrongful termination can only be brought if it falls within one of these narrow exceptions); see, e.g., Lockhart v. Commonwealth Ed. Sys. Corp., 247 Va. 98 (1994) (allowing plaintiffs to pursue their common-law causes of action because their claims were within the scope of the race and gender public policy exclusions).

In the present case, Defendants correctly note that Plaintiff has not alleged that Wynn's termination violated one of the narrow public policy exceptions to the at-will doctrine. Instead, Plaintiff erroneously contends that Wynn's employment was not at-will "but that in practice she was treated as an employee for whom cause was required to justify her termination. This was how plaintiff understood it, and this is the way Wachovia understood it, and this is the way both parties conducted themselves during plaintiff's employment." (Pl.'s Resp. to Mot. Summ. J. 16 (citing Hoffman Co. v. Pelouze, 158 Va. 586 (1932), which states the presumption of at-will employment was rebutted based upon the "interpretation the parties placed upon the matter") Despite Plaintiff's

9

contentions, the facts clearly suggest both parties understood Wynn was hired as an at-will employee, and no change in this status could occur unless it was "clearly stated in a written contract signed by both [Wynn] and an authorized Wachovia representative." (See Defs.' Mot. Summ. J., Ex. A2 at 11.)

Wynn testified in her deposition that she read and understood numerous employment documents stating she was an at-will employee. She understood at-will to mean "that any employer that I work for doesn't owe me an explanation to tell me that I need to pack my things and walk out the door . . . . They need no reason to fire me. They can fire me-at will." (Wynn Dep. 58:17—20.) Therefore, Plaintiff's argument suggesting the parties agreed to an employment relationship other than "at-will" is not persuasive. Further, Plaintiff's contentions that Wachovia had to give reason for Wynn's termination, and this mandate somehow changed Wynn's employment status from at-will to contractual, is not a contention that is grounded in fact or law. Rather, Wynn signed a Wachovia job application that required her to obtain a signed written contract in order to change the status or duration of the employment relationship. No such contract was entered into by Wynn and Wachovia. Accordingly, Wynn's employment was at-will and in order to successfully plead a claim for wrongful termination she must assert that her termination violated Virginia's public policy. As Plaintiff has failed to plead accordingly, Plaintiff has failed to state a claim for wrongful termination.

### 2. Fraud Claim

Plaintiff contends she detrimentally relied on Camp's fraudulent statements that (1) she was not going to be fired and (2) she could continue to take PTO until an investigation of the alleged counterfeit check was resolved. (Am. Compl. ¶ 12(a),(d).) As

10

a result of this reliance, Wynn contends she was unlawfully terminated for job abandonment, and therefore has brought a claim for fraud.  (Id.)

Successful claims for fraud require plaintiffs to prove, by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally or knowingly, (4) with intent to mislead, (5) reliance on this misrepresentation, and (6) resulting damage.  State Farm Mut. Auto. Ins. Co. v. Remley, 270 Va. 209, 218—19 (2005).  Here, Defendants contend Plaintiff has failed to prove that a false representation was made; rather, Defendants assert the alleged statement by Camp was a mere work-related instruction, not a false representation of a material fact.  (Def.'s Mot. Summ. J. 12—13 (citing McMillion v. Dryvit Sys., Inc., 262 Va. 463, 472 (2001) (noting Virginia courts require the statement giving rise to fraud be a misrepresentation of a present or pre-existing fact); Chromalloy Am. Corp. v. Universal Housing Sys., Inc., 495 F. Supp. 544 (S.D.N.Y. 1980) (holding the statement forming the basis of the fraud claim was not a misrepresentation but rather a suggestion or business command)).)  Further, Defendants contend even if there was a false representation, Wynn's reliance upon the representation was not reasonable.  See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 629 (4th Cir. 1999) (stating plaintiff must prove he relied to his detriment on a false representation of a material fact, but also that the reliance "was reasonable and justified").  Defendants are correct.

Assuming, *arguendo*, Camp's alleged statements were false representations, Wynn's reliance upon them was not reasonable.  Wynn was aware she was employed by Wachovia on an at-will basis and understood that she could be terminated for any reason.  Further, Plaintiff read and understood Wachovia's PTO and attendance policies

11

and was aware that she only received 120 hours of PTO per year.  Despite Wynn's knowledge of her employment relationship and attendance requirements, Wynn relied on Camp's alleged statements that contradict these policies.  Based upon Wynn's reasoning, Camp allowed her to remain out of work indefinitely, maintain her paycheck, and use more than her allotted PTO hours, all while the company investigated whether or not she cashed a counterfeit check.  This Court holds similar to other courts that reliance on these alleged verbal promises that contradict clearly written statements is unreasonable.  See, e.g., Bd. of Dirs. of Cardinal Place Condo. v. Carrhomes P'ship., 58 Va. Cir. 602, 608 (Va. Cir. Ct. 2000) (holding that "a buyer's decision to rely on [an oral misrepresentation as to the Seller's identity was] not reasonable, particularly in the face of a document that openly indicates otherwise . . ."); Schryer v. VBR, 25 Va. Cir. 464, 476 (1991) (noting "the terms of the contract were equally known to all parties.  Consequently, plaintiff's reliance on any representations made by the employer's agent was unreasonable").   Accordingly, Plaintiff has failed to show her reliance on Camp's alleged statements were reasonable, and therefore Plaintiff cannot maintain a claim for fraud.

As Plaintiff's claim for wrongful termination and/or fraud fail to state a claim, Defendants' Motion for Summary Judgment is GRANTED as to this claim.

B.  Conversion Claim

A claim for conversion must demonstrate defendant has wrongfully assumed or exercised the right of ownership over property belonging to another in denial of, or inconsistent with, the owner's right.  Economopoulous v. Kolaitis, 259 Va. 806, 814

(2000).  Defendant contends Plaintiff has failed to show each element of this claim; this Court agrees.

It is undisputed that in January 2008, Wynn used 47.5 hours of her annual PTO allotment.  Wynn took additional PTO between February 1 and February 13, 2008, and was absent from work on February 14th, 19th, 20th, 21st, and 25th.  Accordingly, Plaintiff exhausted her yearly PTO allotment on February 25th.  Nevertheless, $873.35 was deposited in Wynn's account on February 28, 2008, the date of her termination.  This entire amount was for PTO Wynn had taken, but not yet accrued.  Per the terms of Wynn's Offer Letter, upon termination she was required to reimburse Wachovia for the amount of PTO that she was paid, but had not yet accrued.   Therefore, Defendants contend that Wachovia's March 6th debit of Plaintiff's account was the company "lawfully recouping money she owed Wachovia;" stated otherwise, Defendants contend the money Wachovia debited from her account was not Plaintiff's and therefore could not be converted.  (Defs.' Mot. Summ. J. 15.)  Moreover, Defendants argue that pursuant to Wynn's Deposit Agreement, Wachovia was allowed to debit her account to obtain any money she owed the bank.  (See Defs.' Mot. Summ. J., Ex. A2 at 48) (stating under this Agreement "you grant us a security interest in your . . . other deposit accounts to use the money from your account(s) maintained with us or our affiliates to pay the debt").)

In contrast, Plaintiff contends Wynn's PTO overage was a result of Camp's specific instructions and therefore Wachovia cannot now "claim it has a right to take Plaintiff's financial assets."  (Pl.'s Resp. to Mot. Summ. J. 18—19.)  Despite Plaintiff's assertions, no factual argument was presented that the money was not owed to Wachovia, or that the manner in which the money was obtained was unlawful.  Rather, Plaintiff merely makes a

13

fairness argument—it is not fair that Wachovia directed Wynn to take the PTO and then took it back.  As stated above, Wynn's decision to take PTO in excess of her yearly allotment was unreasonable and therefore holding Wachovia liable in equity is unwarranted.  Further, as Wachovia's Deposit Agreement allows the bank to debit Wynn's account if she owes Wachovia money, and Wachovia's PTO policy states upon termination Wynn owes the bank for PTO taken but not yet accrued, Wachovia lawfully debited Wynn's account to recover the excess PTO paid.  Therefore, as a matter of law, Wachovia's debiting of Wynn's account cannot be conversion.

Accordingly, as Plaintiff failed to assert and support the claim that Wynn had a right to the money deposited into her account, and that Wachovia's means of exercising ownership over the funds was unlawful, Defendants' Motion for Summary Judgment is GRANTED as to this claim.

C. <u>Defamation Claim</u>

Plaintiff's final claim asserts Wachovia defamed her based upon two statements made by Camp: (1) that Wynn was terminated from employment at Wachovia for "job abandonment", and (2) that Wynn had taken unauthorized PTO from Wachovia.  (Am. Compl. ¶ 15a.)  To state a claim for defamation in Virginia a plaintiff must allege enough facts to raise beyond a speculative level:  "(1) publication of (2) an actionable statement with (3) the requisite intent."  <u>See</u> <u>Jordan v. Kollman</u>, 612 S.E.2d 203, 206 (Va. 2005) (identifying the elements of libel); <u>Fleming v. Moore</u>, 275 S.E.2d 632, 635 (Va. 1981) (noting that there is no distinction between libel and slander).  In resolving Defendants' March 17, 2009 Partial Motion to Dismiss, this Court held Plaintiff failed to sufficiently plead the alleged defamatory statements were published, and therefore granted Plaintiff

14

leave to amend.  (Order on Mot. to Dismiss, May 6, 2009.)  Accordingly, Plaintiff amended the Complaint and alleged Camp publicized, via a February or March 2008 email, that Wynn was terminated due to job abandonment.  (Am. Compl. ¶ 15(b)-(f).)  Defendants now contend summary judgment is proper on this claim because Plaintiff failed to introduce the email, and further because stating that Wynn was fired due to job abandonment is not an actionable statement.

### 1.  Publication

 Defendant contends Plaintiff's evidence—a deposition from a co-worker who claims she saw an email from Camp stating Wynn was terminated for job abandonment—is insufficient to create a genuine issue of material fact that a defamatory statement had been published.  Specifically, Defendants state "[d]espite months of discovery, documents requests and depositions, Plaintiff has not produced the alleged email.  Ms. Camp adamantly denies sending such an email."  (Defs.' Reply Br. 7 (citing Camp Dep. 118).)  Accordingly, Defendants contend Plaintiff has failed to prove the statement was published, and therefore this claim should be dismissed.  Defendants are in error.

In support of the claim for defamation, Plaintiff has submitted the testimony of Stephanie Braswell, a past member of Wachovia's Lost-Stolen Department, who testifies that in February or March 2008, Camp sent an email to the Lost Stolen Team stating that "Kimberly Wynn had been terminated for abandonment of her position; she [is] no longer employed by Wachovia."  (Braswell Dep. 6:8—7:20.)  After the email was sent, Braswell recalls speaking to her co-workers Margaret Henry, Theresa Thomas, and Victoria Tucker about the email.  (Braswell Dep. 10:5—18:24.)  Braswell further noted

15

"there were a lot of people talking about the email that day." (Braswell Dep.

10:5—18:24.)  Nevertheless, no physical copy of the email was recovered, and Braswell is

the only employee who testified to seeing the email. (Defs.' Reply Br. 7—8.) While

Defendants are correct in noting that a physical copy of the email would be preferable,

the absence of such email does not render this a non-issue.  Instead, a sworn deposition

by an individual who recalls seeing the email and discussing it with others, is more than

sufficient to establish that a genuine issue as to whether the defamatory statement was

published.

### 2. An Actionable Statement

Defendants further contend Plaintiff has failed to assert the publication of an

actionable statement; merely stating an employee was terminated due to job

abandonment is not actionable.  Rather, Defendants note the Supreme Court of Virginia

has stated in order for a statement in the context of employment to be defamatory, "the

words must contain an imputation that is 'necessarily hurtful' in its effect upon plaintiff's

business, and must affect him in his particular trade or business.  There must be a nexus

between the content of the defamatory statement and the skill or character required to

carry out the particular occupation of the plaintiff." Fleming v. Moore, 221 Va. 884,

889—90 (1981).  Moreover, Defendants cite to numerous cases for the proposition that

publicizing an employee's termination is not an actionable statement upon which to base

a claim of defamation. See, e.g. BPSS, Inc. v. Wilhold, 2009 U.S. Dist. LEXIS 21630

(E.D. Mo. March 18, 2009) (noting the "mere statement that someone has been

terminated from employment is not in and of itself defamatory" and further stating

because Plaintiff "has failed to plead any facts showing why the statements would be

16

construed as defamatory," Defendant's motion to dismiss was granted); San Antonio
Express News v. Dracos, 922 S.W.2d 242, 248 (Tex. App. 1996) (holding the statement
that someone quit is not actionable as it "does not charge plaintiff with the commission
of a crime or the violation of any law . . . .  It accuses him of absolutely nothing except
what he had a right to do"); Mann v. City of Tupelo, 1995 U.S. Dist. LEXIS 21574 (N.D.
Miss. Apr. 11, 1995) (dismissing plaintiff's defamation claim as the statement "plaintiff
voluntarily quit her employment is not one that would expose her to public hatred,
contempt or ridicule").  However, Defendants cited cases only address statements that an
individual was "terminated" or "quit" not, as is here, that a person abandoned their job.

        Contrary to Defendants assertions, Plaintiff argues Camp's statements that Wynn
abandoned her job harms her business relationships and negatively casts a light on her
character and professionalism.  (Mot.'s Hr'g, July 7, 2009; see also Pl.'s Response to Mot.
Summ. J. 12–13 (citing Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 133 (Va. 2003)
(holding the statements that doctors abandoned their patients was actionable)).)
Specifically, Plaintiff contends Camp did not merely state that Wynn quit her job, but
that Wynn "abandoned her job" which implies she did not  properly resign, give notice,
or honor her commitments, all actions Plaintiff states affects Wynn in her business,
portrays her as irresponsible, and impacts the skills required to carry out her choice of
occupation.  (Id.)  This Court agrees.  Stating that Wynn abandoned her job is unlike
stating a person resigned or quit, an act an individual has a right to do; rather, job
abandonment asserts a person left ones employment without notice or following proper
procedures.  This phrase, therefore, has a negative connotation on an employee as it
portrays them as irresponsible and unprofessional.  Accordingly, this Court holds that

17

Camp's alleged statement that Wynn abandoned her job is "necessarily hurtful" in its effect upon Wynn's business or trade, and negatively describes the skills or character inherent to her customer service work.  Therefore, Defendants' Motion for Summary Judgment is DENIED on this claim.

## III.  CONCLUSION

For the reasons above, this Court GRANTS Defendants' Motion for Summary Judgment as to the Wrongful Termination and Conversion claims, and DENIES the Motion as to the Defamation Claim.

It is SO ORDERED.

_____/s/_____
James R. Spencer
Chief United States District Judge

Entered this _13th___ day of July 2009.